FILED _____   ENTERED
LOGGED _____ RECEIVED

JAN 0 3 2020

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION | : |
| OF THE UNITED STATES OF AMERICA | : NOS. |
| FOR A SEARCH WARRANT | : |
| REQUIRING DISCLOSURE OF | : |
| HISTORICAL CELLULAR SITE INFO. | : |

19 - 4 1 2 0 **DLB**

19 - 4 1 2 3 **DLB**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**
**REQUIRING DISCLOSURE OF HISTORICAL CELLULAR SITE INFORMATION**

Christopher Hiester, a Task Force Officer with the Federal Bureau of Investigation ("FBI")

being duly sworn, states:

1.      This affidavit is being submitted in support of an application for a search warrant

to search the records of AT&T, Sprint, T-Mobile, and Verizon Wireless ("the Service Providers")

to disclose certain records and other information pertaining to the cellular telephone towers

described in Part I of Attachment A.   The records and other information to be disclosed are

described in Part II of Attachment A.

2.      The applied for warrant would authorize the analysis of the transactional records

for the purpose of identifying the individuals responsible for the armed carjacking at the specified

location described in this affidavit, by members of the FBI, or their authorized representatives,

including but not limited to other law enforcement agents assisting in the above described

investigation.

3.      Because this affidavit is being submitted for the limited purpose of establishing

probable cause for a search warrant, I have not included every detail of every aspect of the

investigation.   Rather, I have set forth only those facts that I believe are necessary to establish

probable cause.   I have not, however, excluded any information known to me that would defeat a

1



determination of probable cause.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, police officers, witnesses, cooperating sources, telephone records, and reports. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violation of 18 U.S.C. § 2119  - Carjacking, was committed by the unknown subjects described herein.  There is also probable cause to believe that a search of the cell tower data as described below and in Attachment A will result in identification of the subjects and the recovery of items constituting evidence of these criminal violations.

## AGENT BACKGROUND

5.     I am employed as a Detective with the Baltimore Police Department (BPD), Citywide Robbery Unit.  I have been assigned to the FBI Baltimore Violent Crimes Task Force since 2014, and I am currently responsible for investigating violent crimes, including bank and armored carrier robberies, commercial armed robberies, and carjackings.

## PROBABLE CAUSE

6.     On November 3, 2019, at approximately 11:00 p.m., BPD officers responded to 4501 Wentworth Road, Baltimore, Maryland 21207, in response to an emergency call.  Upon their arrival, BPD officers were met by the caller, who told officers that "something strange" had happened to her daughter, L.C.  It was reported to the investigating officers that L.C. had gone to her mother's home, located at 4501 Wentworth Road, with her children.  L.C. left the residence sometime between 10:00 p.m. and 10:30 p.m., to go to a McDonald's restaurant to get food for her

2

children.  L.C. never returned to the residence.

7.      In the early morning hours of Monday, November 4, 2019, the victim, L.C., was located near a wooded area in the 6000 block of Fairwood Avenue, Baltimore, Maryland 21206.

8.      After L.C. was located, she was interviewed by your affiant.  During the interview, L.C. stated that she had left her mother's house to go to McDonald's.  L.C. indicated that she was on the phone with her boyfriend, T.B., who is currently incarcerated in Baltimore County.  Before she could start her car (a silver 2011 Infiniti G37S, MD tag 3DL553, registered to T.B.)), she was approached by three black males.  At least one of the males was armed with a handgun.  The men forced L.C. out of her vehicle and ordered her to keep her head down.  The men placed L.C. in the back of another silver car and put a blanket over her head.  The vehicle that L.C. was forced into was driven by a fourth suspect, as one of the other three suspects got into L.C.'s Infiniti vehicle. The two cars drove away from the location and traveled a short distance.  L.C. stated that the car she was in stopped.  With the blanket still over her head, L.C. was removed from the silver car and put in the back of a maroon car.  The maroon car was driven by a fifth suspect.  As the maroon car drove away, the first suspect that she had seen with a gun sat next to her.  The suspect placed the gun to her head and said, "This has nothing to do with you.  It has to do with who your boyfriend is talking to."  A second blanket was placed over L.C.'s head to ensure that she could not see the suspects or where they were located.  After driving for a significant amount of time, L.C. stated the car stopped and sat parked for quite a while.  One of the suspects sat in the back seat with L.C., placing what she believed to be a handgun to her head.  During this time, the suspect next to her was on a cell phone, speaking to someone who she believed to be other suspects involved in the carjacking.  The person on the phone directed the suspects to L.C.'s apartment building, located at

121 S. Fremont Avenue, Baltimore, Maryland 21201.  L.C. had provided this information to the suspects but had not given them her apartment number.  She then heard the suspect seated next to her talking to the others about a black dresser in her bedroom.  She realized immediately that the other suspects were in her apartment during the phone conversation between the suspects.

9.      L.C.'s boyfriend, T.B., was on the phone with L.C. at the time of the carjacking and abduction and could hear the initial confrontation between L.C. and the suspects.  T.B. immediately called his mother and told her that something had happened to L.C.  T.B.'s mother went to L.C.'s residence at 121 S. Fremont Avenue to check on her.  Upon her arrival, T.B.'s mother saw masked men inside of L.C.'s apartment.  T.B.'s mother left the location and went to L.C.'s mother's home, where BPD officers were already on scene.

10.      Police officers on the scene at 4501 Wentworth Road called for units to respond to 121 S. Fremont Avenue.  Upon their arrival at 121 S. Fremont, officers observed two black males holding large bags of unknown property standing in front of that location.  As officers approached, the males dropped some of the property and fled.  After a brief foot chase the suspects could not be located.  In front of the apartment building (121 S. Fremont Avenue), officers discovered that one of the suspects had dropped a loaded Springfield 9mm handgun.  Officers also discovered that L.C.'s apartment had been ransacked and robbed.

11.      L.C. told officers that she was talking on one of her two cellphones when the suspects initially grabbed and abducted her.  The cellphone that she was using was dropped inside of her Infiniti vehicle that was taken by one of the suspects.  A second cell phone was inside of L.C.'s purse, which was also in the Infiniti vehicle.  The suspects did not allow L.C. to take any personal belongings with her when she was abducted and placed into the  first vehicle.  The

4

cellphone numbers for L.C.'s cellphones are (443) 707-9581 and (443) 813-4795. Both cellphones are provided service by T-Mobile.

12.     Your affiant knows through training, knowledge, and experience, as well as the shared experiences of investigators familiar with carjackings and commercial robberies, that the crimes described in this affidavit indicate that at least two suspects were in contact utilizing cellular telephones during commission of the carjacking and abduction of L.C.  Therefore, it is probable that the subjects' cellular telephones would utilize the same cellular towers as L.C.'s phones, which were in her carjacked vehicle.  In addition, one of L.C.'s cellphones was being used at the time of the carjacking and was dropped in the carjacked vehicle.  Therefore, the cell tower data would assist investigators in identifying the cell towers and cellphone numbers utilizing the towers at the time of the crimes, potentially identifying cellphone numbers utilized by the suspects.

13.     Based on the above, your affiant believes the information requested in the search warrant can assist in identifying the subjects or subjects and as evidence in court for the crime of carjacking and associated firearms offenses.

## FACTS ABOUT CELL TOWERS IN GENERAL

14.     Many cellular service providers maintain antenna towers ("cell towers") that serve specific geographic areas. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity.  These cell towers allow the wireless devices to transmit or receive communications, such as phone calls, text messages, and other data.  The tower closest to a wireless device does not necessarily serve every call made to or from that device.

15.     In addition to a unique telephone number, each cell phone is identified by one or more unique identifiers.  Depending on the cellular network and the device, the unique identifiers

for a cell phone could include an Electronic Serial Number ("ESN"), a Mobile Electronic Identity

Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module

("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an

International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment

Identity ("IMEI").

16.     Cellular service providers routinely maintain historical cell-tower log information,

including records identifying the wireless telephone calls and communications that used a

particular tower.  For each communication, these records may include the telephone call number

and unique identifiers for the wireless device in the vicinity of the tower that made or received the

communication ("the locally served wireless device"); the source and destination telephone

numbers associated with the communication (including the number of the telephone that called or

was called by the locally served wireless device); the date, time, and duration of the

communication; the "sectors" (i.e., the faces of the towers) that received a radio signal from the

locally served device; and the type of communication transmitted through the tower (such as phone

call or text message).

## PURPOSE OF THE SEARCH

17.     Based on the factual circumstances and chronology of the armed carjacking and

abduction of L.C., it is likely that the subjects' mobile devices would have used the towers that

served the areas near the location of the carjacking and near L.C.'s residence.  Identifying a mobile

device that used those towers on the specified date and times would lead to the identification of

the subjects.  Each of the subjects' mobile devices would have a unique telephone number and

Electronic Serial Number ("ESN"), which is registered to a respective carrier.  The carrier would

6

have identifying subscriber information, which can be used to identify the individual utilizing a specific mobile device. Upon identification of a mobile device, your affiant will obtain a subpoena to obtain the subscriber information from the respective carrier to further the investigation.

## **REQUEST FOR A SEARCH WARRANT**

21.    Given the facts set forth above, your affiant has probable cause to believe the records described in Attachment A would identify which wireless devices were in the immediate vicinity of the addresses listed in Attachment A around the time the armed carjacking occurred in November 2019. This information, in turn, will assist law enforcement in determining the wireless devices utilized by the subjects.

22.    WHEREFORE, I respectively request that the Court issue a warrant authorizing members of the FBI, or their authorized representatives, including but not limited to other law enforcement agents assisting in the above described investigation, to analyze the records, as described in Attachment A, for the purpose of identifying the individual responsible for the armed carjacking described above.

Christopher Hiester
Task Force Officer
Federal Bureau of Investigation

Sworn to before me on this ___ day of December 2019.

DEBORAH L. BOARDMAN
UNITED STATES MAGISTRATE JUDGE

ATTACHMENT A

## I.     The Cell Towers

This warrant applies to certain records and information associated with cellular telephone towers ("cell towers") that provide coverage to the following areas at the listed date and times:

| Location | Dates | Times |
|---|---|---|
| 4501 Wentworth Road Baltimore, Maryland 21207 | November 3, 2019 | 10:00 p.m. through 11:50 p.m. (EST) |
| 121 S. Fremont Avenue Baltimore, Maryland 21201 | November 3-4, 2019 | 11:45 p.m. through 01:10 a.m. (EST) |
| 6100 Fairwood Avenue Baltimore, Maryland 21206 | November 4, 2018 | 12:10 a.m. through 02:00 a.m. (EST) |

## II.    Records and Other Information to Be Disclosed

For each cell tower described in Part I of this Attachment, the Service Providers named in the Search Warrant are required to disclose to the United States all records and other information (not including the contents of communications) about all communications made using the cell tower during the corresponding timeframe(s) listed in Part I, including the records that identify:

A.     the telephone call number and unique identifiers for each wireless device in the vicinity of the tower ("the locally served wireless device") that registered with the tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network

8

Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

B.     the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that called, or was called by, the locally served wireless device);

C.     the date, time, and duration of each communication;

D.     the "sectors" (i.e. the faces of the towers) that received a radio signal from each locally served wireless device; and

E.     the type of communication transmitted through the tower (such as phone call or text message).

These records should include records about communications that were initiated before or terminated after the specified time period, as long as part of the communication occurred during the relevant time period identified in Part I.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by [Provider], and my official title is _____.  I am a custodian of records for [Provider].  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of [Provider], and that I am the custodian of the attached records consisting of _____ (pages/DVDs/terabytes).  I further state that:

      a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

      b.     such records were kept in the ordinary course of a regularly conducted business activity of [Provider]; and

      c.     such records were made by [Provider] as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____

Date                             Signature